G. Mark Albright
Nevada Bar No. 1394
William H. Stoddard, Jr.
Nevada Bar No. 8679
Albright, Stoddard, Warnick and Albright
801 S Rancho Dr D4, Las Vegas, NV 89106
Phone: (702) 384-7111
Fax: (702) 384-0605
Email: gma@albrightstoddard.com
Email: bstoddard@albrightstoddard.com
*Attorneys for Plaintiff*

*See Signature Page for Additional Counsel*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| W. A. SOKOLOWSKI, Individually and On Behalf of LAS VEGAS SANDS CORP., <br><br> Plaintiff, <br><br> v. <br><br> SHELDON G. ADELSON, MICHAEL A. LEVEN, JASON N. ADER, IRWIN CHAFETZ, CHARLES D. FORMAN, GEORGE P. KOO, CHARLES A. KOPPELMAN, JEFFREY H. SCHWARTZ, VICTOR CHALTIEL, IRWIN A. SIEGEL, and FREDERICK HIPWELL, <br><br> Defendants, <br><br> - and - <br><br> LAS VEGAS SANDS CORP., A Nevada Corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY DEMAND** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**I.      JURISDICTION AND VENUE**

1.      This Court has jurisdiction pursuant to (a) 28 U.S.C. §1331 because Counts I and II assert claims for violations of § 14(a) of the Exchange Act and SEC Rule 14a-9; (b) diversity jurisdiction under 28 U.S.C. § 1332(a)(2), as Plaintiff and each Defendant are citizens of different states, and the value of the relief requested exceeds $75,000, exclusive of interest and costs; and (c) the Court's supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367(a).

2.      This Court has jurisdiction over each Defendant because each either is an individual with sufficient minimum contacts with this District, or is a corporation conducting business and operating in this District.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)(2) and (3) and § 1401 because some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred or were initiated in this District.

4.      In addition to Plaintiff's individual claims asserted pursuant to federal law, this action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.  This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.

**II.      NATURE OF ACTION AND SUMMARY OF CLAIMS**

5.      This is a shareholder's action brought by Plaintiff derivatively on behalf of Las Vegas Sands Corporation ("Sands" or the "Company").  No claims are asserted herein against Sands, which is a Nominal Defendant.

6.      Sheldon G. Adelson ("Adelson"), Michael A. Leven ("Leven"), Jason N. Ader ("Ader"), Irwin Chafetz ("Chafetz"), Charles D. Forman ("Forman"), George P. Koo ("Koo"), Charles A. Koppelman ("Koppelman"), Jeffrey H. Schwartz ("Schwartz"), Victor Chaltiel ("Chaltiel"), and Irwin A. Siegel ("Siegel")(all of whom sometimes are referred to collectively as "the Individual Defendants"), each of whom was serving on the Company's Board of Directors ("Board"), collectively and individually initiated or actively participated in a course of conduct that was designed to, and did:

(a) Conceal the fact that the Company's management was improperly misrepresenting Sands' internal controls in order to allow a widespread scheme of overseas bribery, kickbacks, money laundering and other wrongful behavior in violation of applicable federal and other laws and, thereafter, cover-up such wrongdoing;

(b) Assign to the Board's Audit Committee and purportedly independent legal counsel, an "investigation" that was intended as a pretext to avoid the Individual Defendants having to account to Sands for their wrongdoing;

(c) Deceive the investing public, including shareholders of Sands, regarding the Individual Defendants' management of the Company's operations;

(d) Fail to comply with the books and records, and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") and the Bank Secrecy Act as well as conceal such violations of law;

(e) Conceal material facts with respect to purported audits performed by PricewaterhouseCoopers, LLP ("PWC"), of which Defendant Frederick Hipwell ("Hipwell") is a Partner;

(f) Waste Sands' assets by means of, *inter alia*, causing the Board's Audit Committee to carry out a purported investigation of the wrongdoing alleged herein without any benefit flowing to the Company;

(g) Cause the issuance and dissemination of Sands' 2013 Proxy Statement, which was false and misleading;

(h) Use Sands' corporate assets to further the political interests of the Company's largest shareholders, Adelson and his wife;

(i) Cause Sands to terminate its long-held plans to invest in a casino complex in Spain because of, *inter alia,* Defendant Adelson's demand for relaxation of Spain's anti-money laundering laws, political activities and his negative reputation;

(j) Disregard and/or intentionally breach the Company's Code of Business Conduct and Ethics as well as other written policies governing their conduct; and

(k) Enhance the Individual Defendants' positions as directors and/or officers of Sands while providing each of them with substantial compensation, power, and prestige.

7.     At material times, while serving as Sands' purportedly independent public accounting firm (*i.e.* auditor), Hipwell and PWC failed to provide to the Company the independent auditing services it was well-compensated to provide, negligently or otherwise failed to conduct its audits of Sands' financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") as it was engaged to do, and issued false and misleading "clean" opinion letters as to the Company's year-end financial statements.

8.     Sands has become the subject of years-long investigations by the U.S. Department of Justice ("DOJ"), the U.S. Securities and Exchange Commission ("SEC"), the Nevada Gaming Control Board ("NGCB"), and the U.S. Federal Bureau of Investigation ("FBI"). Upon information and belief, Sands' activities are also being investigated by the Chinese government. The Company has expended, and will continue to expend, significant amounts of resources and hundreds of millions of dollars to address these investigations.  The Individual Defendants have admitted that any finding of violations of the FCPA as described herein could have a material adverse effect on the Company's financial condition.  A violation of rules and regulations of the NGCB could jeopardize Sands' gaming license in Nevada.  It is likely that Sands will be subjected to massive future fines and penalties, and be required to make material changes to its business practices.

9.     The Company already has suffered massive economic damages as well as damage to its reputation as a direct result of the wrongdoing alleged herein.  On March 7, 2013, Moody's Investor's Service ("Moody's") downgraded Sands' rating outlook from positive to stable following the Company's disclosure that it likely had violated the FCPA's books and records provisions.  Keith Foley, a Senior Vice President at Moody's explained: "At this point, the primary obstacle to a higher rating is [Sands'] current inability to provide independent verification that the FCPA issue will be resolved in a manner that does not materially impair the company's reputation or financial profile."  A negative rating action could occur, especially if the SEC, DOJ or any other regulatory body discover violations of any material corporate

governance issue such as those alleged herein.

10.    In addition to the common law claims alleged herein, this action charges the Individual Defendants with directly participating in and/or aiding and abetting violations of §14 (a) of the Securities Exchange Act of 1934 and Rule 14a-9 thereunder.  Plaintiff seeks to recover for Sands the damages caused and currently being caused to the Company by the Defendants. This action also seeks the appointment of a Special Master or Conservator to oversee and direct the Company's negotiations with the DOJ and the SEC with respect to the wrongdoing alleged herein since the Board and legal counsel, due to their personal conflicts of interest, cannot conduct such negotiations consistent with their duty of loyalty to Sands.

11.    The allegations in this Complaint are based upon personal knowledge as to Plaintiff and his ownership of shares of Sands, and on information and belief as to all other matters, such information and belief having been formed by the investigation conducted by and under the supervision of his counsel, which included, among other things: (a) review and analysis of the Company's public filings with the SEC; (b) review of the 2011, 2012, and 2013 Proxy Statements; (c) review of other publicly available information, including articles in the news media; (d) review of the Company's website and press releases; (e) consultation with persons knowledgeable regarding the facts and circumstances alleged herein; and (f) review of the shareholder derivative Complaints and related materials in litigations commenced against some or all of the Individual Defendants.

## III.    PARTIES

12.    Plaintiff W.A. Sokolowski owns, and has continuously owned, common stock in Sands during the period of the wrongdoing alleged herein.  Plaintiff is a citizen of New Jersey.

13.    Nominal Defendant Sands is a corporation organized under the laws of Nevada with its principal executive office located in Las Vegas, Nevada. Sands' stock is listed and traded on the New York Stock Exchange. Sands is a Nominal Defendant only, and no claims are asserted against it. Its role in connection with this litigation is being controlled by its Board, all members of which are defendants herein, and the Company's Chief Executive Officer, Defendant Adelson. In turn, Plaintiff alleges and believes that the Board's actions are being

controlled by Richard A. Sauber, Esq., the law firm of O'Melveny & Myers LLP ("O&M"), including partner Daniel Bookin, Esq., and other lawyers working closely with Defendant Adelson to protect him and his colleagues from personal liability for the wrongdoing described herein.

14.     The Company owns and operates integrated resort properties featuring gaming, retail, convention, and exhibition facilities in Asia and the United States, including in Singapore, the Macao Special Administrative Region of the People's Republic of China, Las Vegas, Nevada, and Bethlehem, Pennsylvania. Until the project was recently aborted, the Company was also planning a major casino resort development in Spain. The Company's presently existing developments include the Venetian Resort Hotel Casino, the Palazzo Resort Hotel Casino, the Sands Expo and Convention Center, and Marina Bay Sands.  Through its majority-owned subsidiary, Sands China, Ltd.("SCL"), the Company also owns the Venetian Macao Resort Hotel, Sands Macao Hotel, Four Seasons Hotel Macao, and the Four Seasons Apartments in the Cotai Strip section of Macao.

15.     The Individual Defendants are named defendants solely with respect to the wrongdoing that occurred while they served as directors of Sands.

16.     Defendant Adelson has been the Company's Chief Executive Officer ("CEO"), and Chairman of the Board ("Chairman") since August 2004.  As a member of the Nominating and Governance Committee since April 2008, he has dominated and controlled the Board, hand selecting who serves on the Board and determining the remuneration they receive.  Adelson is a citizen of Massachusetts.  Adelson also serves as the Chairman of the Board of Directors of the Company's subsidiary, SCL.

17.     Since the Company's initial public offering in 2004, Adelson has been the Company's controlling shareholder, exercising unfettered control over the management and daily operations of the Company.  Indeed, as Defendants admit but understate in each of the Company's Form 10-K filings with the SEC, filed on March 1, 2011, February 29, 2012, and March 1, 2013, Defendant Adelson "exercises significant influence over business policies and affairs, including the composition of Board of Directors and any action requiring the approval of

stockholders, including the adoption of amendments to articles of incorporation and the approval of a merger or sale of substantially all of assets. The concentration of ownership may also delay, defer or even prevent a change in control of our company and may make some transactions more difficult or impossible without the support of Mr. Adelson."

18. Defendant Adelson's influence over the other Individual Defendants is demonstrated by the circumstances surrounding the March 2009 forced resignation of William P. Weidner ("Weidner"), then President and Chief Operating Officer ("COO") of Sands, and an employee of Sands for more than 14 years.

19. Beginning in or about 2008, Sands felt the impact of a deteriorating economy and experienced a decline in share value from an all-time high of $148.76 on October 29, 2007 to $1.42 on March 9, 2009. Defendant Adelson and Weidner disagreed on when to access capital markets in order to avoid breaching the maximum leverage ratios set by Sands' bank creditors, and a bitter dispute erupted between them.

20. A special Executive Committee, comprised of Defendants Leven, Chafetz, and Siegel, was formed on October 29, 2008 to "address governance concerns raised by the Senior Management Members, address a number of outstanding differences between our Chief Executive Officer and other Senior Management Members and in response to a loss of confidence by certain Senior Management Members in the management of the Company and our governance process."

21. In March 2009, two Board members met with Weidner to inform him that the Company (i.e. Adelson) had decided to replace him with defendant Leven, the Chair of the Executive Committee, and Adelson's trusted ally. Four days later, Weidner submitted his resignation. With the ouster of Weidner, the thorn in Adelson's side, the Executive Committee was then dissolved.

22. In response, James Purcell, a longtime Sands Board member, also submitted his resignation, citing his disagreement with the Board's process leading to the forced resignation of Weidner. In particular, Purcell wrote: "It was in my judgment wrong to engage in discussions with Weidner to request his resignation without a full and open discussion of the potential

consequences of the series of actions that were planned. No business enterprise should undertake the significant actions that have been and are proposed to be taken today without a full meeting of its Board."

23.     Defendant Adelson's response to Weidner's resignation was that the departure was not a loss for the Company, but "Just the opposite." Defendant Adelson made clear that he has "always been in charge" of the Company and Board and that he was instrumental in the forced resignation. He stated, "We just sort of helped [Weidner] out a little bit…[w]e helped him resign a little bit."

24.     One of Defendant Leven's first decisions as President and COO of Sands was to hire Steven C. Jacobs ("Jacobs") to head the Company's Macau operations and later serve as CEO of its spin-off, SCL. Jacobs questioned Adelson's management of the Company and refused to comply with Adelson's unlawful directives to engage in illicit business practices that would have violated the FCPA. Defendant Adelson responded that "he was Chairman of the Board and the controlling shareholder of [SCL] and would do as [he] please." Jacobs was then dismissed. The ensuing litigation that followed on October 20, 2010 exposed the Individual Defendants' pervasive breaches of fiduciary duties, and blatant violations of the FCPA, as well as Adelson's unfettered control and domination of the Company.

25.     Defendant Adelson consciously and purposely has engaged in a course of conduct that exposes the Company to potential fines and sanctions and severe scrutiny by federal and state regulators. Specifically, he has directed Company employees to use illicit means to induce senior Macau government officials to obtain favorable business results, as well as to aggressively grow the Company's junket business, in violation of Nevada state regulations.

26.     The Board continuously has submitted to Adelson's wishes and provided him and his family with a slew of perquisites. Defendant Adelson and his family members receive security and transportation at considerable expense to Sands, valued at more than $2.5 million annually. Adelson's wife, Dr. Miriam Adelson, has been employed as Director of Community Involvement, and his step-daughter has been employed as his Special Assistant since 2007. Sands has also engaged in business transactions with entities owned and/or operated by Adelson

1   and his family members, including the purchase of products from Deluxe Hotels Supply, LLC, a

2   company owned by Adelson's brother, and time-sharing agreements with Interface Operations,

3   LLC, a company controlled by Adelson himself.  While these arrangements purportedly have

4   been made on normal, commercially-available terms, the Company has not disclosed enough,

5   either in its 2013 Proxy Statement or otherwise, to evaluate the truth of such representations

6           27.     Defendant Leven has been the Company's President and Chief Operating Officer

7   since March 2009, Secretary since June 2010, and a Company Director since August 2004.

8   Leven is also a Director of SCL, had been Special Advisor to SCL's Board from October 2009 to

9   July 2010 and SCL's acting CEO from July 2010 to July 2011.  Leven was also a Director of Las

10  Vegas Sands, Inc., the predecessor of Las Vegas Sands, LLC, from May 2004 to July 2005.  The

11  Board repeatedly has determined that Leven is not independent.  Leven is a citizen of Nevada.

12          28.     Leven knowingly or recklessly allowed the Company to engage in illegal

13  activities that violate the FCPA by authorizing Company employees to improperly leverage

14  Macau officials to obtain favorable business results, to openly permit illegal money laundering at

15  Sands' casinos and by failing to implement or maintain adequate internal controls.  Defendant

16  Leven acknowledged that there were obvious FCPA issues arising from the Company's hiring of

17  Leonel Alves ("Alves") as its Legal Advisor, given Alves' position in the Macau government.

18  Nevertheless, the Individual Defendants acquiesced in Adelson's wishes and rubber-stamped

19  Alves' employment at Sands.

20          29.     Defendant Forman has been a Company Director since August 2004.  He also has

21  been a Director of Las Vegas Sands, LLC, a subsidiary of Sands, since March 2004.  Defendant

22  Forman was the Vice President and Legal Advisor of the Interface Group, an entity controlled by

23  Defendant Adelson, from 1989 to 1995.  The Board repeatedly has determined that Forman is

24  not independent due to his close business and personal relationship with Defendant Adelson.

25  Forman is a citizen of Massachusetts.

26          30.     Defendant Chafetz has been a Company Director since March 2005.  Chafetz was

27  also a Director of Las Vegas Sands, Inc., the predecessor of Las Vegas Sands, LLC, from March

28  2005 to July 2005.  The Board repeatedly has determined that Mr. Chafetz is not independent

due to his close personal and business relationship with Defendant Adelson. Chafetz is a citizen of Massachusetts.

31.     Over a span of more than fifty years, Defendant Chafetz has held numerous jobs reporting to Defendant Adelson and has maintained a close personal relationship. From 1984 to 1990, Defendant Chafetz was the President of Five Star Aircraft/Airlines, a division of the Interface Group, LLC, an entity controlled by Adelson. He was a stockholder, vice president and director of Interace from 1989 to 1995, where he reported to Adelson, who was the President and Chairman. Many public media outlets have noted the close relationship between Chafetz and Adelson, describing him as a "former business partner who has known Mr. Adelson since grade school" and a "lifelong friend of Mr. Adelson." Indeed, Chafetz serves as the trustee of several trusts for the Adelson family.

32.     Defendant Koo has been a Company Director since April 2008, and he is a member of the Board's Compensation Committee. Koo was a special advisor to the Chinese Services Group of Deloitte & Touche LLP from April 2008 until March 2013, after having been its Director from April 1999 until April 2008. Koo is a citizen of New York.

33.     Defendant Siegel has been a Company Director since February 2005 and the Chairman of the Audit Committee since April 2008. In violation of his Audit Committee duties, Siegel knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements. Siegel also has been a Director of SCL since October 2009 and was a Director of Las Vegas Sands, Inc. from February 2005 to July 2005. Siegel is a certified public accountant and was a partner at Deloitte & Touche LLP from 1973 to 2003. Siegel is a citizen of Georgia.

34.     Defendant Schwartz has been a Company Director, a member of the Audit Committee, and Chair of the Board's Compensation Committee since March 2009. In violation of his Audit Committee duties, Schwartz knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements. Schwartz also has been a Director of SCL since October 2009. Schwartz is a citizen of Nevada.

35.     Defendants Adelson, Leven, Schwartz, and Siegel breached their duties of loyalty

by directing SCL employees to illegally bribe Macau officials, and by instructing the hire of Leonel Alves as Legal Advisor. Defendant Adelson's directives, and Defendants Leven, Schwartz, and Siegel's authorization and execution of Adelson's directives, were in contravention of the FCPA and Nevada gaming rules.

36.    Defendant Ader has been a Company Director, a member of the Audit and Compensation Committees, and Chair of the Board's Nominating and Governance Committee since April 2009. In violation of his Audit Committee duties, Ader knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements. Ader is a citizen of New York.

37.    Defendant Koppelman has been a Company Director, and member of the Nominating and Governance, and Compensation Committees since 2011. He has been a director of Six Flags Entertainment Corp. since May 2010, where he serves on the audit and compensation committees. Koppelman is a citizen of New York.

38.    Defendant Chaltiel has been a Company Director, and member of the Nominating and Governance, and Compensation Committees since December 2012. Chaltiel is a citizen of Nevada.

39.    Each of the foregoing Individual Defendants either was hand-picked by Adelson to serve as a Director of Sands, or Adelson personally acquiesced in their appointment. Each has served on the Board, and thereby reaped substantial fees, perquisites and emoluments, at Adelson's pleasure. None of these Directors can be considered independent or disinterested, none is sufficiently removed from the underlying wrongdoing described herein or its subsequent cover-up, and none of them can address the demands made on them independently or with disinterest

40.    Each member of the Sands' Board knew that operating in Macao involved a higher than normal risk of violating American and Chinese anti-corruption laws. Nevertheless, in the face of such specific knowledge, the Individual Defendants breached their fiduciary duties by failing to implement or maintain adequate internal controls and accounting systems to prevent violations of the FCPA as well as Nevada gaming regulations and/or to require the Company's

1    management to do so.  Thus, each of them knowingly, recklessly, and/or with gross negligence

2    caused the Company to violate the FCPA as well as the Bank Secrecy Act in order to generate

3    business.  In the case of the Individual Defendants other than Adelson, they participated and/or

4    acquiesced in such conduct to maintain the favor of Adelson and keep their positions as

5    Directors of Sands and all of the substantial personal benefits that inured to them as a result.

6            41.    The Individual Defendants were well-informed about and/or actively participated

7    in the wrongdoing alleged herein, particularly the bribery of Chinese and Macau officials,

8    acquiescence in illegal money laundering activities at Sands' casinos, failure to implement and

9    maintain adequate internal controls as well as deception of the investing public and federal and

10   state regulators.  They abdicated their respective stewardship responsibilities to the Company by

11   acquiescing and/or participating in the wrongdoing alleged herein and by placing their loyalty to

12   Adelson above their loyalty to Sands.

13           42.    The members of the Sands Board, each of whom was personally appointed or

14   approved by Adelson, receive hundreds of thousands of dollars each year in fees and stock

15   awards as well as very liberal "reimbursement of expenses."  In addition, they received stock

16   options potentially worth millions of dollars.

17           43.    Defendant Hipwell is the Managing Partner of PWC at its Las Vegas office and is

18   named a defendant herein in his capacity as a partner of PWC.  The references to "Individual

19   Defendants" in this Complaint do not refer to Defendant Hipwell.  As a partner of PWC,

20   Defendant Hipwell is responsible for its breach of its contractual obligations to Sands and its

21   errors and omissions in connection with the conduct referred to herein.  At relevant times, PWC

22   and the Individual Defendants portrayed PWC as Sands' independent auditor and,

23   simultaneously, PWC provided to Sands consulting and other services.

24   IV.    **SUBSTANTIVE ALLEGATIONS**

25           A.    **FCPA Requirements and Nevada Gaming Regulations**

26           44.    Sands is a multinational resort development and gaming company.  Sands' stock

27   trades on the New York Stock Exchange under the symbol "LVS."  As an issuer under the

28   United States federal securities laws, Sands' business and operations are subject to the FCPA.

12

45. The FCPA, enacted in 1977, makes it unlawful for, *inter alia*, United States issuers of registered securities, such as Sands, to make improper payments, bribes, and kickbacks to any foreign official as a way to obtain or retain business. 15 U.S.C. §78dd-l. The FCPA also requires covered companies to devise and maintain a system of internal accounting controls to ferret out such illicit payments. Non-compliance with the FCPA may result in fines, sanctions, and other adverse actions, including exposing the Company to civil liability.

46. Sands, as a company incorporated and headquartered in Nevada, must also comply with the state's gaming laws, which prohibit "unsuitable" associations that "reflect or tend to reflect discredit upon the State of Nevada or the gaming industry."

### B.   Sands' Macau Operations

47. According to Sands' annual report, Macau is the largest gaming market in the world and the only market in China to offer legalized casino gaming. Many American gaming companies have stayed away from Macau since it has been plagued by bribery, political corruption and the influence of organized crime. A 2011 International Narcotics Control Strategy Report by the United States State Department noted that Macau is "vulnerable to becoming a hub for the laundering of criminal proceeds."

48. In June 2002, Sands, in a joint venture with a Hong Kong based corporation, Galaxy Entertainment Group ("Galaxy"), was granted one of three gambling concessions by the Macau government and became the first American operator to open a casino on Chinese soil. When Sands and Galaxy parted ways, Macau officials changed its gambling policy and awarded Sands gambling concessions independent of Galaxy.

49. Three separate civil suits were filed against the Company alleging that Sands failed to pay contracted fees for brokering the joint venture between Sands and Galaxy. Weidner, the Company's former President and COO, testified that the joint venture was orchestrated by the Macau government. Out of concern that the pending litigations would reveal violations of the FCPA, Sands retained outside legal counsel specializing in FCPA issues in order to prepare a defense in case the SEC or DOJ were to investigate the 2002 bidding process.

50. On October 15, 2004, Richard Suen and Round Square Company Limited filed an

action against Sands, Adelson, and Weidner in the District Court of Clark County Nevada asserting a breach of contract to pay a success fee of $5 million and 2% of the net profits from the Company's Macau resort operations. On May 24, 2008, the jury returned a verdict in favor of Suen and his company in the amount of $43.8 million. On June 30, 2008, a judgment was entered in the matter in the amount of $58.6 million. The Company appealed the verdict to the Nevada Supreme Court, and on November 17, 2010, the judgment was reversed and remanded to the District Court. The case went to trial in April and May of 2013 and a jury verdict in the amount of $70 million was awarded to the plaintiffs which award, together with pre-judgment interest, was $101.6 million. On July 30, 2013, Judge Rob Bare denied Sands' request for a new trial or to reduce the jury award.

### C. Hiring Alves

51. Sands hired Alves, a local Macau attorney, as SCL's Legal Advisor, despite the Board's knowledge of his extensive ties to the Macau government, and probable FCPA violations associated with his retention. Alves was a member of both the Executive Council, which serves as the government's top advisory body, and the Legislative Assembly, which is responsible for enacting, amending, suspending, and repealing legislation, as well as Chairman of the Audit Committee for Macau's monetary authority. The impropriety of Alves' employment by SCL while Sands actively pursued concessions from the Macau government to sell strata-title ownership of the Four Seasons Apartments in the Cotai Strip highlights the Individual Defendants' failure to implement adequate internal controls.

52. In a *Macau Daily Times* article dated September 19, 2010, Defendant Leven stated of Alves, "He was a close advisor of [SCL] throughout the last year and we would be very interested in having him back." Leven acknowledged "[w]hen we deal with an individual that is a Government official – Alves is also a member of the Executive Council, an advising body to the local government – we have to follow the rules of the U.S."

53. In 2011, *ProPublica* disclosed internal corporate documents that indicate that Defendant Adelson ordered that $700,000 in purported legal fees be paid with Sands' funds to Alves.

### D.   Association with Chinese Organized Crime

54.   Sands also has been directly linked to Chinese organized crime in Macau, which uses casino property to run their loan-sharking, junket and prostitution operations.

55.   *Reuters* published an article on March 29, 2010 detailing Sands' ties to organized crime as follows:

> "The murder-for-hire case sheds light on the links between China's secretive triad societies and Macau's booming gambling industry. It also raises potentially troubling questions about one of the world's largest gaming companies, Las Vegas Sands, which plans to open a $5.5 billion Singapore casino resort in late April.
> Cheung [Chi-tai] was not just named as a triad member but also, according to a regular casino patron testifying in the trial, "the person in charge" of one of the VIP rooms at the Sands Macau, the first of three casinos run here by Las Vegas Sands. In addition, Cheung has been a major investor in the Neptune Group, a publicly traded company involved in casino junkets -- the middlemen who bring wealthy clients to Macau's gambling halls. Documents show that his investment allowed him a share in the profits from a VIP gambling room at the casino.
> An examination of Hong Kong court records, U.S. depositions from the former president of Sands, and interviews with law enforcement and security officials in both the U.S. and Macau, reveals a connection between Las Vegas Sands and Cheung -- ties that could potentially put Sands in violation of Nevada gaming laws."

56.   Jacobs alleges in his lawsuit that he objected to Adelson's scheme "to intimidate and mislead *Reuters* and its investigative journalists as to the accuracy of the March 29, 2010 article by sending *Reuters* a demand for retraction which falsely claimed defamation." Additionally, Jacobs alleges that the Company commissioned background checks on Cheung, who was in charge of running the junket rooms at Sands Macao, and a few others connected to him.

57.   Defendant Adelson and, upon information and belief, each of the members of the Sands' Board of Directors, were aware of a report distributed to Sands' senior management documenting Cheung's connection with Chinese organized crime, but never caused Sands to sever the relationship with Cheung.  After all, the junket system is extremely profitable. According to the March 2011 *Reuters* article, the junket companies "generated an incredible 72 percent of the region's gaming revenues last year."

58.   The Individual Defendants knew that the Company's well-known association with

"unsavory or unsuitable persons" was in direct violation of Nevada gaming laws, but they refused to stop such associations notwithstanding the risks to Sands in Nevada and elsewhere. They also knew that the FCPA anti-bribery violations, and Sands' involvement with Chinese organized crime was being investigated by various state and federal regulatory agencies, and the results could lead to the loss of Sands' gaming license and/or severe financial effects for the Company.

### E.    Knowledge and Disclosure of the FCPA Violations

59.    The Individual Defendants' attempts to manipulate and induce the Macau government's cooperation with the Company's business agenda was first revealed to the public on October 20, 2010 when Jacobs filed a lawsuit in Nevada disputing the terms of his dismissal on July 23, 2010 and exposing the Company's series of FCPA violations and breaches of applicable state laws at the behest of Defendant Adelson.

60.    Jacobs alleges that Defendant Adelson instructed him (a) to use "improper leverage" against senior Macau government officials in order to obtain a concession from the Macau government to sell strata-title ownership to the Four Season Apartments in Macau; (b) to threaten Chinese banks in order to improperly induce them to pressure senior Macau government officials to deliver strata-title of the Four Seasons Apartments and give favorable concessions with respect to labor quotas and table limits; (c) to conduct secret investigations of senior Macau government officials in order to uncover information that could be used to thwart government initiatives adverse to Sands; (d) to hire as SCL's Legal Advisor Leonel Alves, a local Macau attorney and member of Macau's Legislative Assembly and the Macau Executive Council, despite known FCPA issues; and (e) to grow the junket business but to avoid disclosing material information to SCL's Board regarding Company involvement with notorious Chinese organized crime figures, in direct contravention of Nevada gaming regulations and other applicable law.

61.    While it was not until early 2011 that shareholders began to learn of the magnitude and severity of Sands' FCPA problems, the Individual Defendants became aware of the potential violations much earlier, but did nothing to address the issues.

62.    On March 1, 2011, Sands filed its annual report on Form 10-K for the period

ended December 31, 2010.  There, the Company disclosed that the SEC and DOJ were conducting investigations for possible violations of the FCPA.  Specifically, the Company stated:

> "On February 9, 2011, LVSC received a subpoena from the Securities and Exchange Commission requesting that the Company produce documents relating to its compliance with the Foreign Corrupt Practices Act.  The Company has been advised by the Department of Justice that it is conducting a similar investigation.  It is the Company's belief that the subpoena may have emanated from allegations contained in the lawsuit filed by Steven C. Jacobs described above.  The Company intends to cooperate with the investigations."

63.    The Form 10-K further stated, "Any determination that we have violated the FCPA could have a material adverse effect on our financial condition."  Notwithstanding such disclosure, which discussed a possible adverse effect upon Sands, the Individual Defendants were advised by their legal counsel that the financial consequences of the FCPA violations would be quite substantial and material to the Company's financial condition, which consequences have remained concealed. In addition, the Individual Defendants did not disclose the extent to which the SEC and DOJ were seeking substantial penalties, both financial and otherwise, from Defendant Adelson.

64.    Defendant Leven has stated that the SEC and DOJ investigations may take several years, and they involve "a voluminous amount of information, [that] go back probably five years at least."

65.    Many investors reacted to the news and rushed to dispose of their shareholdings. Sands' market capitalization fell by over $2.1 billion, or 6.3% in one day, on March 1, 2011.

66.    On March 2, 2011, *The Wall Street Journal* reported that the NGCB began a probe into the Company's FCPA violations and association with Chinese organized crime.

67.    On March 11, 2011, in an article entitled "Special Report: Macau Connection", *Reuters* revealed that the FBI had begun its own investigation as well.  It also reported that Sands provided NGCB with a report on an alleged criminal figure, "but it has gone out of its way to stop the reports from reaching the public eye."

68.    Upon information and belief, the Board delegated to the Audit Committee the authority to investigate the matters raised in the SEC subpoena and DOJ inquiry, as well as other

transactions in mainland China, as described below.  Richard W. Grime, Esq. and Daniel Bookin, Esq., partners at O'Melveny & Myers, LLP ("O&M") were retained, purportedly by the Board's Audit Committee, to perform an independent investigation in connection with the government probes.

69.   Beyond the investigations into Sands' Macau ventures, the Board's Audit Committee is allegedly investigating at least three transactions in mainland China: a $50 million payment for office space for the Adelson Center for U.S.-China Enterprise in Beijing, Sands' sponsorship of a Chinese basketball team, and a contract for ferry service between Macau and Hong Kong.

70.   In 2005, Sands announced a plan to invest more than $1 billion to build the Adelson Center, which was to be a non-gambling convention center and retail complex on the Chinese island of Hengqin, near Macau.  Sands spent $50 million to secure space for the Adelson Center, hiring Yang Saixin as an intermediary to make the payments and help facilitate this deal and others in China.  The Company has disclosed that China's State Administration of Foreign Exchange fined Sands about $1.63 million in 2010 for improperly using funds earmarked to the Adelson Center to pay a company associated with Mr. Saixin.  Sands decided in 2008 to stop construction, purportedly due to financial reasons.

71.   Sands paid $8 million to sponsor and take control of a professional Chinese basketball team.  Mr. Saixin bought the team on Sands' behalf.  The Audit Committee and NGCB purportedly are investigating whether any payments were made to government officials, since, upon information and belief, approximately $1.45 million is not accounted for.  The basketball deal was terminated in 2008.

72.   The investigations are also purportedly probing the creation of a high-speed ferry service to bring gamblers from Hong Kong to Macau.  The ferry is operated in partnership with a company controlled by China's Guangdong province and a company affiliated with Mr. Saixin.

73.   In an October 20, 2011 article in *The Wall Street Journal*, it was reported that Sands' General Counsel, Gayle Hyman, circulated an internal memo instructing Sands employees to retain documents regarding "transmission of anything of value" to current and

former Macau government officials and their family members, including Alves, and seeking a list of government officials who have gambled in the Company's casinos in Macau.

74.   According to *The Wall Street Journal*, as reported on August 9, 2012, the Audit Committee provided to the NGCB a preliminary report, prepared with the aid of outside counsel, O&M, that said the Company's "controls and books and records were not sufficient." The report apparently notes that the issue of deficient controls and records has previously been investigated internally, and the Board adopted new measures in February 2010.

75.   On March 1, 2013, the Company disclosed that it had informed the SEC in its December 31, 2012 10-K that an internal review, presumably by the Audit Committee, found the casino had "likely violated" the books and records and internal controls provisions of the FCPA.

76.   The Company further stated that "[b]ased on the information provided to management by the Audit Committee and its counsel, the Company believes, and the Audit Committee concurs, that the preliminary findings: do not have a material impact on the financial statements of the Company; do not warrant any restatement of the Company's past financial statements; and do not represent a material weakness in the Company's internal controls." Notwithstanding such statement, which the Individual Defendants knew or should have known was unjustified, the 10-K Report went on to state that the Audit Committee's "investigation" was "largely completed" but still continuing. Significantly, the 10-K contradicted the statement above by saying: "Based on proceedings to date, management is currently unable to determine the probability of the outcome of this matter, the extent of materiality, or the range of reasonable possible loss, if any."

77.   The details about the "investigations" into Sands' business practice and possible violations of the FCPA have been closely guarded and not fully disclosed to Sands' shareholders. Notwithstanding such secrecy, the members of the Audit Committee and their counsel, Daniel Bookin, Esq., have long-known of the serious violations of the FCPA and other laws by the Individual Defendants. Upon information and belief, the timing of the conclusion of the "investigations" and the issuance of a final report thereupon has been delayed at the request of Defendant Adelson or counsel representing his interests in connection with ongoing DOJ and

1  SEC negotiations over the extent of the sanctions that would be imposed on Sands and, possibly,

2  Defendant Adelson.

3         **F.**    **Resignation of PWC as Outside Auditor**

4       78.    During the 2012 annual audit of Sands' financial statements, the Audit Committee

5  advised the Board and PWC that "there were likely violations of the books and records and

6  internal control provisions of the FCPA" but that the Company's practice "has improved" in

7  those areas in recent years.

8       79.    In an SEC filing in April 2013, Sands reported that PWC resigned as the

9  Company's auditor after having worked for Adelson and companies he controlled for 25 years.

10  The Company reported that there had not been any "reportable disagreements." Upon

11  information and belief, Sands' disclosure of likely FCPA violations, without notifying PWC,

12  created hostility between Sands and PWC, particularly given the increasingly serious discomfort

13  PWC and its Las Vegas and Hong Kong-based partners had with respect to Sands' business

14  practices, its lack of adequate controls, its fundamental doubts as to whether Sands' financial

15  statements were prepared in accordance with Generally Accepted Accounting Principles

16  ("GAAP") and PWC's own conflicts of interest by serving as an auditor while, at the same time,

17  providing other lucrative services to the Company.

18       80.    Additionally, PWC appears to have been concerned at potential exposure from the

19  re-trial of the lawsuit by Richard Suen referred to above. According to Sands' 2009 proxy

20  statement, PWC was paid more than $200,000 in 2008 for consulting services on the Suen case.

21  This payment was made to PWC while it served as Sands' outside auditor. It is a violation of

22  auditor independence rules to advocate for an audit client in court while also opining on the

23  client's books and records. Moreover, as PWC well knew, but disregarded in opining on Sands'

24  financial statements, the Company had "likely violated" the books and records and internal

25  controls provisions of the FCPA over a multi-year period.

26       81.    A month after PWC resigned, Sands appointed Deloitte & Touche LLP to serve as

27  the independent outside accounting firm.

28

### G.  Money Laundering

82.  On August 4, 2012, *The Wall Street Journal* reported that beyond the FCPA probes, Sands was also being investigated for possibly violating money-laundering laws in its handling of two so-called "high-rollers."

83.  In its 10-Q quarterly filing with the SEC, Sands reported that it received subpoenas on August 1, 2013 seeking documents relating to two prior customers, Zhenli Ye Gon, the owner of a pharmaceutical company that manufactured ingredients used in methamphetamines, awaiting extradition to Mexico for drug trafficking offenses, and Ausaf Umar Siddiqui, a former vice president at Fry's Electronics, convicted of taking illegal kickbacks from the chain's suppliers.

84.  Under the Bank Secrecy Act, casinos are required to report suspicious illegal activity of patrons' funds.  Upon information and belief, the money laundering activities are widespread within the Company's casinos.

85.  Mr. Ye Gon had wired the proceeds of his narcotics sales to himself at Sands in Las Vegas.  Even though he was "the largest all-cash, up-front gambler the Venetian-Palazzo had ever had to that point", Sands management did nothing to identify the source of his funds, pursuant to the Board's "look the other way" policy.  The Company should have identified as "suspicious" the wire transfer of approximately $45 million and the depositing of approximately $13 million in cashier's checks between February 2005 and March 2007.  The DOJ obtained evidence that "when casino personnel asked Ye Gon to wire the money in larger lump sums, as opposed to breaking it up incrementally, and use consistent listed beneficiaries, Ye Gon stated that he preferred to wire the money incrementally because he did not want the government to know about these transfers."  The Company's failure to report this activity was in violation of the Bank Secrecy Act, all of which violations were known or should have been known to the Individual Defendants.  While the members of the Sands' Board may not have known about individual money laundering transactions, they certainly knew that their acquiescence therein generally encouraged management of the Company's casinos to do nothing about them, despite their illegality.

86.     Besides failing to report on Ye Gon, who had lost more than $125 million gambling at Las Vegas casinos between 2004 and 2007, Sands also did not report on Siddiqui, who had transferred $121 million to Sands and MGM Resorts International casinos while earning just $225,000 annually from Fry's.

87.     In January 2013, *The Wall Street Journal* reported that Sands was, purportedly, improving its anti-money laundering compliance program and ceased "executing international money transfers for its high-roller customers." As part of this overhaul, Sands retained Jerry Markling in July 2013 to be the Venetian's Director of Investigations. Notwithstanding these relatively cosmetic steps, Defendant Adelson, in attempting to develop EuroVegas in Spain, was urging the Spanish government to relax its own anti-money laundering enforcement.

88.     In June 2013, *The Wall Street Journal* reported that a grand jury had been empaneled in Los Angeles to investigate the money laundering at Sands' casinos.

89.     On August 27, 2013, the Justice Department announced that it had resolved its money laundering investigation of the Company and that Sands agreed to "return" $47,400,300 to the U.S. Treasury in order to avoid criminal prosecution. This settlement does not resolve the DOJ's FCPA and other investigations into Sands' business operations.

90.     In addition to the substantial damages caused the Company arising out of the DOJ's money laundering investigation and settlement, which cost it millions of dollars in excess of the $47.3 million payment, the Company was forced to cancel its long-planned EuroVegas development in Madrid arising out of Defendant Adelson's demand, among others, that Spain relax its anti-money laundering enforcement as a condition to the casino complex being built. Adelson, had proposed the 22 billion-euro ($30 billion) EuroVegas project, which was to include 12 hotels, six casinos, a convention center, golf courses, theaters, shopping malls, bars and restaurants and was in its planning stages for approximately 7 years. The negotiations were, at times, hostile. The union that would have benefitted from the EuroVegas project has said it welcomes the decision not to proceed with the project and, in particular, does not accept the demands of Adelson, pointing to his and Sands' "dubious" reputation. The Company had expended tens of millions of dollars on this now-terminated project, the loss of which was caused

in part due to Adelson's regrettable demand that Spain relax its anti-money laundering laws and, as well, the "dubious" reputation Adelson and Sands have developed in connection with the wrongdoing referred to herein.

### H.   False Certifications

91.     As senior officers of Sands, Defendants Adelman and Leven, among others in management, had extensive duties to ensure the accuracy and completeness of financial information disseminated to investors.

92.     As noted in American Institute of Certified Public Accountants ("AICPA") auditing standard, Section 110.03, a public company's management is responsible for preparing financial statements in accordance with GAAP:

> "The financial statements are management's responsibility.... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal controls is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility."

93.     In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the duty of management to present a true representation of a company's operations:

> "[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

94.     Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules promulgated thereunder, the chief executive officer and chief financial officer of reporting corporations, such as Sands, are required to certify as to the accuracy and completeness of a company's financial statements.

95.     At all relevant times, Sands' senior management, including Defendants Adelson and Leven and the Audit Committee, repeatedly opined that internal controls over financial reporting were adequate, despite the fact that there was no check on Defendant Adelson's behavior, and that there was known, widespread bribery in Macau, money laundering generally,

as well as other serious wrongful conduct as referred to herein directed by Defendant Adelson, and acquiesced in by the Individual Defendants.  Notwithstanding such wrongdoing, Defendants Adelson and Leven unjustifiably executed "clean certifications" pursuant to Sections 302 and 906 of Sarbanes-Oxley.  These certifications falsely and deceptively stated, *inter alia,* that the Company had disclosed all significant deficiencies and material weaknesses in the design for operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information.  As such, Defendants Adelson and Leven are liable to the Company as a result of their false certifications.

## V.    BREACHES OF COMPANY POLICIES

### A.    The Individual Defendants' Roles and Responsibilities

96.    As officers and/or directors of the Company, the Individual Defendants owed to the Company and its shareholders fiduciary duties of trust, due care, candor, good faith, and loyalty.  Each of the Individual Defendants knew it was his fiduciary duty and responsibility to use his utmost ability to oversee the management and administration of Sands' business and affairs, to ensure the Company complied with all of its legal obligations and operated in a diligent, honest and prudent manner, and to ensure that effective policies, procedures, systems, and internal controls are in place to prevent, detect and promptly terminate any unlawful corporate conduct or unethical business practices such as those described above.

97.    Each Individual Defendant acquiesced in at least some of the wrongful conduct described herein, thereby breaching his fiduciary duty of loyalty and good faith owed to the Company and its shareholders.  Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which each director faces a substantial threat of personal liability.

98.    Each Individual Defendant breached his respective duty of loyalty and good faith by knowingly permitting management to engage in violations of the FCPA, anti-money laundering laws and other laws, rules and regulations applicable to Sands and its subsidiaries, as described herein, and by failing to implement and/or maintain adequate internal controls to check

24

1 Defendant Adelson's domination over the Company and to prevent violations of the FCPA and

2 other laws, as described herein.

3       99.    The Individual Defendants, as a result of their service on the Board and on the

4 committees described fully in Sands' 2010, 2011, 2012, and 2013 Proxy Statements, their

5 knowledge and expertise as alleged therein, the receipt by the Board and those committees of

6 regular and complete reports, and as reflected in the Company's belated 2013 disclosures of

7 probable FCPA violations and violations of federal anti-money laundering laws, were aware of

8 the unlawful and unethical business practices alleged herein, yet knowingly and/or recklessly

9 breached their fiduciary obligations as officers and/or directors of Sands, by permitting them to

10 be continued.

11       100.    Sands' improper inducements and underhanded practices aimed at influencing

12 Macau government officials in order to secure favorable concessions for the Company were not

13 the result of a rogue employee or division, but instead, notwithstanding the Code of Business

14 Conduct and Ethics and Anti-Corruption Policy, reflected a Company-wide, "anything goes"

15 business philosophy, directed, encouraged and aggressively pursued by Defendant Adelson.

16 Such philosophy was aimed at increasing Sands' revenues and profits through the payment of

17 bribes in violation of the FCPA, the engagement in money laundering and acquiescence in

18 prostitution at Sands' casinos over compliance with laws and regulations designed to protect the

19 Company without due regard to the long-term consequences of such wrongdoing. Upon

20 information and belief, these widespread practices were well known to senior management and

21 the entire Board, and were knowingly pursued despite their knowledge of its illegality and/or

22 cover-up and the inevitable harm to Sands. The Company's management, accompanied by

23 Board passivity, knowingly made a calculated bet that any legal consequences from the bribery

24 and other wrongful conduct described herein would not be found out by governmental regulators

25 and enforcement agencies. By knowingly or negligently permitting this strategy to continue,

26 notwithstanding its well-publicized codes of behavior, the Board adopted it as Company policy,

27 and committed a sustained and systematic failure of compliance oversight in breach of each

28 Board member's fiduciary duty of loyalty and good faith.

101.    None of the Individual Defendants took steps to disclose Sands' bribery, money laundering activities and passive encouragement of prostitution promptly to the DOJ, the SEC, Nevada gaming authorities and other regulatory agencies, as they were legally required to do. Were it not for the falling out between Steven Jacobs and Defendant Adelson leading up to the Jacobs lawsuit, the government investigations may not have commenced and/or commenced when they did.

102.    As pointed out below, the Individual Defendants flagrantly disregarded Sands' Audit Committee Charter, Anti-Corruption Policy, Code of Business Conduct and Ethics, and the Board of Directors' Corporate Governance Guidelines. The Company's Board published such documents hypocritically, knowing that they would not be and were not being followed.

**B.    Breach of Sands' Audit Committee Charter**

103.    Defendants Ader, Schwartz, and Siegel (the "Audit Committee Defendants") owed specific heightened duties as members of the Board's Audit Committee. Pursuant to the Audit Committee's Charter, in effect since April 2006, and as amended in April 2008, these Defendants are responsible for being the Board's front line in the oversight of compliance with laws and regulations and enforcement of Sands' Code of Business Conduct and Ethics and Sands' Anti-Corruption Policy.

104.    Sands' current and prior Audit Committee Charters state, in substance:

> "The primary purpose of the Audit Committee is to assist the Board…. of [Sands] in fulfilling its oversight responsibilities with respect to (a) the accounting and financial reporting processes of the Company, including the integrity of the financial statements and other financial information provided by the Company to its stockholders, the public, any stock exchange and others, (b) the Company's compliance with legal and regulatory requirements, (c) the independent registered public accounting firm's qualifications and independence, (d) the audit of the Company's financial statements, (e) the performance of the Company's internal audit function and independent registered public accounting firm and (f) such other matters…."

105.    Both before and since being charged with responsibility to investigate the claims made in pre-existing shareholder derivative litigations, and following the sending of Plaintiff's Demand Letter to the Board, the Audit Committee has abjectly and knowingly, with the advice of legal counsel, failed to fulfill the foregoing responsibilities.

106.    In particular, during the period of the wrongdoing alleged herein, the members of the Audit Committee failed to fulfill their oversight responsibilities with respect to the accounting and financial reporting processes of the Company, including the integrity of the financial statements and other financial information, which they knew or should have known were not accurate, were not audited by an independent auditor and suffered material control shortcomings.

107.    Moreover, each of the members of the Audit Committee serving at the times of the wrongdoing alleged herein were personally aware or should have been aware that the Company was not in compliance with legal and regulatory requirements including, inter alia, the FCPA and anti-money laundering laws.  At all relevant times, the members of the Audit Committee had total access to all documents and information bearing upon the Company's operations, including the information relevant to the wrongdoing referred to herein.  In addition to each of such members of the Audit Committee being members of the Board, they were charged with specific responsibilities that enhanced their access to such documents and information pursuant to, *inter alia*, ¶¶IV 9-12, 16, 20, 27 of the Audit Committee Charter which required them to:

> "9. Meet to review and discuss the Company's annual audited financial statements with management, the internal audit group and the independent registered public accounting firm, including reviewing specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations. 10.  Discuss with the independent registered public accounting firm the matters required to be discussed by Statements on Auditing Standards Nos. 61, 89 and 90, as amended, or any other Applicable Requirements. 11.  Based on the review and discussions referred to in paragraphs 4, 9 and 10 above, recommend to the Board whether the Company's annual audited financial statements should be included in the Company's annual report on Form 10-K for filing with the Securities and Exchange Commission. 12.  Prepare the report required by the Securities and Exchange Commission to be included in the Company's periodic reports, annual proxy statement and any other reports of the Audit Committee required by Applicable Requirements. 16.  Periodically meet separately with each of management, the independent registered public accounting firm and the internal audit group. At such meetings review (a) any significant disagreement between management and the independent registered public accounting firm or the internal audit group in connection with the preparation of the financial statements, (b) any difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information and (c) management's response to each. 20.

Review and discuss with management, the internal audit group, the independent registered public accounting firm and the Company's in-house and independent counsel, as appropriate, the Company's legal compliance report and any legal, regulatory or compliance matters that could have a significant impact on the Company's financial statements, including applicable changes in regulatory and accounting initiatives, standards or rules. 27. In consultation with the independent registered public accounting firm and the internal audit group, review the adequacy of the Company's internal controls and its procedures designed to ensure compliance with laws and regulations and any special audit steps adopted in light of material control deficiencies."

108.   By knowingly and recklessly failing to ensure internal controls were in place, and by allowing Defendant Adelson to exercise unbound discretion and personal autonomy over the Company's operations resulting in the wrongdoing described above, the Audit Committee Defendants breached their fiduciary duties of loyalty and good faith owed to the Company.

109.   In light of the widespread nature of the wrongdoing referred to herein, particularly the violations of the FCPA and anti-money laundering laws, the members of the Audit Committee effectively acquiesced therein and were (and are) personally responsible for the cover-up of such wrongdoing. As such, they were not and could never be considered independent, disinterested or investigating the wrongdoing claimed by Plaintiff and other Sands' shareholders in good faith.

### C.   Breach of Sands' Anti-Corruption Policy

110.   Sands' current and previous Anti-Corruption Policy states, in substance:

"**This Policy is issued to assure that the hospitality and business development practices of all operations of [Sands] anywhere in the world are fully consistent with applicable record keeping and anti-corruption laws, including the U.S. Foreign Corrupt Practices Act and the Sarbanes-Oxley Act of 2002. This Policy reflects the fundamental values of [Sands],** and all employees, consultants and agents employed by [Sands] are expected to honor them fully, both in letter and spirit. Violation of this Policy can be grounds for immediate termination.

Under the laws of every state and country in which we do business, it is a crime to pay a bribe to obtain or maintain government business or to obtain an unfair advantage. Under U.S. law, LVSC, its affiliates and subsidiaries may not give anything of value, directly or indirectly, to, or for the benefit of, any (i) foreign government official, (ii) foreign government agency, (iii) foreign political party, or (iv) candidate for foreign political office, in exchange for influencing any official action in favor of the Company.

"Anything" means anything as liability can attach from the first dollar and includes currency, monetary instruments and in-kind payments and gifts.

"Directly and indirectly" includes to the official (as broadly defined above), to their family members, and through third-parties such as agents, consultants, junketeers, and other contractors.

The term "foreign official" is interpreted broadly and includes employees as well as those who are appointed or elected. It also includes employees of state owned or controlled enterprises as well as governmental bodies. This means gaming licensing officials outside the U.S. are "foreign officials" for purposes of this Policy.

It is the policy of LVSC to comply with all applicable laws, including anti-corruption laws such as the FCPA, and to avoid even the appearance of impropriety. [emphasis in original]

As all of our financial records must be complete and accurate, any payments to or for the benefit of foreign officials or entities must be recorded accurately and fairly in our books, records, and accounts. The records for all such payments shall be made available to the Company's auditors and others responsible for the preparation and review of the Company's financial statements to ensure that the Company's financial statements are accurate and comply with all applicable accounting principles." [emphasis added]

111.   Defendant Adelson, directly and/or through subordinates, blatantly violated the Company's stated Anti-Corruption Policy by, inter alia, causing the direct and/or indirect payment of bribes to foreign officials in violation of the FCPA and acquiescing in the violation of Nevada, federal and other laws by permitting the laundering of money at the Company's casinos, all of which caused Sands tens of millions of dollars in damages.

### D. Breach of Sands' Code of Business Conduct and Ethics

112.   In 2005, the Board said it adopted Sands' Code of Business Conduct and Ethics in order to "maintain high business ethics and standards." The Code of Business Conduct and Ethics mandates compliance with **"both the letter and spirit of all laws, rules, and regulations applicable to the Company's business"** and specifically directs strict compliance with the internal accounting control and record-keeping requirements of the FCPA, which the Individual Defendants have breached and/or disregarded repeatedly. [emphasis added]

113.   On January 4, 2012, Defendant Adelson sent a widely-publicized and wholly hypocritical letter to Sands' Directors, Officers and Employees. In such letter, also published on the Company's website, Defendant Adelson stated:

"Every day, we do business in a world that is increasingly focused on the appearance of conduct as well as the conduct itself. We function in a highly regulated environment that presents unique challenges and opportunities for us to demonstrate that the trust we have earned…is well-founded."

114.    Defendant Adelson attached to his letter the then-updated Sands' Code of

Business Conduct and Ethics which, among its lofty but un-observed proclamations of the

Company's policies states:

> "As every member of the Las Vegas Sands Corp. (sometimes referred to as the
> "Company") team knows, our core commitment is to "unmatched guest service" that
> complements maximizing shareholder value. An essential component of that commitment
> is integrity. In order to preserve the integrity of the Company's business and the manner
> in which we are perceived by co-workers, government regulators, customers, suppliers,
> competitors, and the communities in which we live and work, it is imperative that each
> officer, director and employee conduct his or her business and personal affairs with
> integrity."

115.    The updated Code of Business Conduct and Ethics (the "Code"), attached to

Adelson's letter, discusses some of the ethical and legal principles that must guide all of the

Company's officers, directors, employees in their work.  The Code states as follows:

> "**This Code is intended to prevent violations of law and corporate policy, and
> to promote:**
>
> (1)     **Compliance with all applicable governmental laws, rules and
> regulations;**
>
> (2)     **Full, fair, accurate, timely and understandable disclosure** in reports
> and documents that the Company files with or submits to governmental agencies,
> including the Securities and Exchange Commission and gaming regulatory bodies and in
> other third-party communications made by the Company;
>
> (3)     **Honest and ethical conduct**, including the ethical handling of actual or
> apparent conflicts of interest between personal and professional relationships;
>
> (4)     **The prompt internal reporting of possible violations of this Code** to an
> appropriate person or persons identified in this Code; and
>
> (5)     Accountability for adherence to this Code…
>
> All persons subject to this Code have a duty to cooperate truthfully and fully in
> the investigation of any alleged violation of the Code. In addition, an employee may be
> subject to disciplinary action, which may include termination of his or her employment, if
> the employee fails to cooperate in an investigation, deliberately provides false or
> misleading (including diverting, misdirecting, or offering incomplete) information during
> an investigation, or deliberately conceals or destroys records or anything in order to

hinder the investigation. If, at the conclusion of the investigation, it is determined that a violation of this Code has occurred, we will take prompt remedial action commensurate with the severity of the offense. This action may include disciplinary action against the accused party, up to and including termination. Reasonable and necessary steps will also be taken to prevent any further violation of the policy at issue."

[emphasis added]

116.     Notwithstanding such Code, Defendant Adelson repeatedly violated its terms. Moreover, upon information and belief, despite their knowledge of ongoing investigations of the Company's illegal practices, neither the members of the Audit Committee nor the Board as a whole commenced any serious internal investigation.  It was only after publicity regarding the DOJ/SEC investigations and the commencement of shareholder derivative litigation in 2011 did the Board and Audit Committee set in motion their own purported investigation, which investigation (later to allegedly include the claims made in Plaintiff's Demand Letter) was intended to generate a "whitewash" of the culpability of Defendant Adelson and all members of the Board.

117.     The Code of Business Conduct and Ethics states, *inter alia*:

" Full, fair, accurate, timely and understandable disclosure in the reports and other documents that the Company files with, or submits to, the Securities and Exchange Commission, gaming and other regulators and in its other public communications is critical for the Company to maintain its good reputation, to comply with its obligations under the securities laws and any other applicable laws and regulations and to meet the expectations of its shareholders, bondholders and other members of the investment community. Persons responsible for the preparation of such documents and reports and other public communications are to exercise the highest standard of care in their preparation in accordance with the following guidelines:

•        all accounting records, and the reports produced from such records, must be in accordance with all applicable laws;

•        all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;

•        all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses;

•        no accounting records should contain any false or intentionally misleading entries;

•        no transactions should be intentionally misclassified as to accounts, departments or accounting periods;

•        all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;

•        no information should be concealed from the internal auditors or the independent auditors; and

- compliance with the Company's system of internal controls is required..."

118.   Indeed, contrary to the letter and spirit of Defendant Adelson's January 4, 2012 letter and Code of Business Conduct and Ethics, the Board and legal counsel used every means at their disposal (a) to frustrate the investigations of the DOJ and SEC and to delay, as long as possible, (b) to delay public disclosure of the wrongful conduct of the Board and senior management as described herein; and (c) to avoid ultimate accountability for such wrongdoing. From the time of the wrongdoing alleged herein to the present, the Board and senior management of the Company specifically breached their obligation to make "Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to governmental agencies, including the Securities and Exchange Commission" as specifically mandated by the Code of Business Conduct and Ethics.  In fact, the Board's Compliance Committee, which was charged by the Code to oversee compliance with its terms, abjectly failed and continues to fail in carrying out the responsibilities which it has been assigned.  Indeed, there is no evidence that such Committee even functions.

119.   Each member of the Sands' Board, among others, was required to and, upon information and belief, did execute the following statement, which appears at the end of the Code:

> DIRECTOR, OFFICER & EMPLOYEE STATEMENT:
> I have read, understand and acknowledge the principles and standards of conduct contained in the Las Vegas Sands Corp. Code of Business Conduct and Ethics. I will adhere to and comply with such principles and standards. I am presently unaware of any violation of this Code that I have not reported as required. I understand that this statement and agreement does not constitute or give rise to any contract of employment.
> Please sign here: _____
> Please print your name: _____
> Date:_____

120.   Notwithstanding the execution of the foregoing statements, Defendant Adelson, the members of the Audit and Compliance Committees and each of the other Individual Defendants knowingly failed to adhere to "the principles and standards of conduct contained in the Las Vegas Sands Corp. Code of Business Conduct and Ethics."  Moreover, each of the Individual Defendants who executed the foregoing statement, despite their personal knowledge

of the wrongdoing alleged herein, falsely stated, "I am presently unaware of any violation of this Code that I have not reported as required." In addition to the violations of the FCPA and anti-money laundering laws referred to herein, each of the Individual Defendants and members of senior management were well aware that prostitutes were given free access to the Company's casinos and were further aware that casino management routinely devised various subterfuges to have prostitutes provided to gamblers.

### E.   Breach of Sands' Board of Directors Corporate Governance Guidelines

121.   Sands' current and previous Board of Directors Corporate Governance Guidelines states, in its most significant provision:

> "Majority of Independent Directors. The Board will be composed of a number of independent directors sufficient in order to comply with the requirements of the Securities Exchange Act of 1934 (the "Exchange Act") and the New York Stock Exchange listing standards. The Board will determine, based on all of the relevant facts and circumstances, whether each director satisfies the criteria for independence and must disclose the identity of each independent director and the basis for the Board's determination of independence in the Company's annual proxy statement or, if the Company does not file an annual proxy statement, in the Company's annual report on Form 10-K."

122.   As a result of his and his wife's direct and indirect Sands shareholdings, Defendant Adelson controls every aspect of the Company's business including, *inter alia*, all nominations to the Company's Board of Directors. Although the Guidelines proclaim that a majority of Board members should be independent, none of the Sands directors is, in fact, free of the control of Defendant Adelson. Each of them owes his appointment, power and lucrative compensation package to Adelson, who has either directly caused each of them to be appointed to the Board or has acquiesced in their appointments as directors. Thus, each of Sands' directors owes fealty to Defendant Adelson and will take no action contrary to his personal interests. Even if the nominally independent Board members satisfy the rather lax standards for independence set by the Exchange Act and the New York Stock Exchange listing standards, the reality is that each director owes personal fealty to Defendant Adelson and, thus, cannot seriously be considered independent.

## VI.   **WRONGDOING OF PWC**

123.   During the period of the wrongdoing alleged herein, the Audit Committee of the Board appointed PWC as Sands' independent registered public accounting firm (i.e. auditor). As an integral part of its obligations to Sands and its shareholders and pursuant to the terms of its annual retention until it resigned, PWC was obligated to, *inter alia:* carry out its audits in conformity with GAAS, and render its opinions that the Company's financial statements were prepared in conformity with GAAP and were otherwise accurate in all material respects.

124.   It was PWC's responsibility to evaluate Sands' internal controls, which it repeatedly failed to do over a period of at least five years or, to the extent that it did so, any such evaluation was performed negligently. Thus, despite knowing otherwise, PWC stated in each of its annual opinion letters, as follows:

> "in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, [each such year], based on criteria established in Integrated Internal Control Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)."

125.   If PWC had conducted its year-end audits of Sands' consolidated and subsidiary financial statements in conformity with GAAS, as it was contractually obligated to do, and as an expert in the auditing of casino businesses, it either was obvious or should have been obvious to PWC that the Company's internal controls were materially deficient and that Sands was engaging in the material wrongdoing alleged herein.

126.   During the fiscal years ended December 31, 2011 and 2012 and through April 23, 2013, both PWC and the Company maintained, either by words or deeds, that there were no disagreements between them as to any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements if not resolved to the satisfaction of PWC would have caused it to make reference to the subject matter of the disagreements in connection with its reports on the Company's consolidated financial statements for such years.

127.   PWC, its engagement partners and their colleagues, were motivated to "look the other way" and deliver "clean" opinions as to Sands' year-end financial statements when, in fact,

PWC knew that such "clean" opinions were wholly unjustified.  In order to retain the continued

patronage and substantial fees generated by Sands and the other Adelson-controlled entities,

other than in fiscal year 2008,[1] PWC repeatedly generated "clean," unqualified opinions that the

year-end financial statements of the Company and its subsidiaries were prepared in accordance

with GAAP and that such statements were audited by it in conformity with GAAS when PWC

knew such representations were false and would deceive the investing public and the SEC.

128.     Thus, despite its knowledge to the contrary, PWC repeatedly opined in its annual

opinion letters provided to the Board and to Sands shareholders, that:

> "[i]n our opinion, the consolidated financial statements listed in the
> accompanying index, present fairly, in all material respects, the financial position of Las
> Vegas Sands Corp. and its subsidiaries at December 31 [of each year], and the results of
> their operations and their cash flows for each of the three years in the period ended…. in
> conformity with accounting principles generally accepted in the United States of
> America."

129.     The statements made by PWC in its annual opinion letters on Sands' year-end

financial statements were materially false and misleading because of, *inter alia*, the widespread

deficiencies in Sands' internal controls known or which should have been known to PWC and

each of the members of the Audit Committee that allowed much of the unlawful conduct

complained of herein to occur, including, bribing Macau officials to obtain favorable concessions

in violation of the FCPA, failing to report suspicious money laundering activities in violation of

the Bank Secrecy Act, and associating with Chinese organized crime in running a junket

business in the Macau ventures.

130.     Notwithstanding, or perhaps because of PWC's acquiescence, Sands' Audit

Committee repeatedly selected PWC as the Company's auditor and proposed its choice to Sands'

shareholders for ratification.

131.     Additionally, for approximately 25 years, PWC was beholden to Defendant

Adelson and/or Sands and/or Adelson-controlled entities, and provided auditing, consulting, and

other services. At such times as it was providing non-audit services to Sands and/or was

---

[1] While PWC issued a "going concern" report on Sands' viability in November 2008, later that same month, PWC
lifted such warning.

providing services to Defendant Adelson and entities controlled by him and his family, PWC was not independent insofar as Sands was concerned. Notwithstanding such lack of independence, until its resignation as Sands' auditor on or about April 23, 2013, it represented falsely in its opinion letters to Sands Board that it was independent, a fact known or which should have been known by all Board members.

132.    Sands was damaged by the continued engagement of PWC during at least the last three years thereof as PWC continued to be in breach of its engagement, for which Sands continued to pay it substantial sums. In the course thereof, Sands paid millions of dollars in fees which, under the circumstances, were unjustly paid and received.

133.    PWC resigned as Sands' auditor once the Company disclosed publicly in early 2013, in an SEC filing: "There were likely violations of the books and records and internal controls provisions of the FCPA." Oversight of the "books and records [of Sands] and internal control provisions of the FCPA" went to the heart of not only the Audit Committee's unfulfilled responsibilities but, in particular, to the purported audits carried out by PWC as falsely represented in its annual opinion letters.

134.    PWC, by acting as it did, either negligently or deliberately, participated in the cover-up of the wrongdoing alleged herein, and allowed the Individual Defendants cover-up to be perpetuated even after PWC resigned as Sands' auditor.

135.    Ultimately, PWC's failure to acknowledge publicly and, in particular, in filings with the SEC, Sands' lack of adequate financial and operational controls, harmed the Company to a substantial extent, to a degree that cannot presently be determined.

## VII.    DERIVATIVE ALLEGATIONS

### A.    General Derivative Allegations

136.    Plaintiff brings this action derivatively in the right and for the benefit of Sands to redress the breaches of fiduciary duty, waste of corporate assets, unjust enrichment and other wrongful conduct by the Individual Defendants as alleged herein.

137.    Plaintiff owns and has continuously owned common stock in Sands beneficially during the period of the wrongdoing alleged herein.

138.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

139.    Plaintiff will adequately and fairly represent the interests of Sands and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting this type of action.

**B.      Plaintiff has Made Pre-Suit Demand Pursuant to Rule 23.1**

140.    Sands' Board of Directors at the time Plaintiff commenced this litigation was comprised of the following ten individuals: Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, Siegel, Koppelman, and Chaltiel.  Each such defendant owes his position as a director, together with the substantial financial and other benefits thereof, to Defendant Adelson.

141.    On January 22, 2013, Plaintiff made a pre-suit demand on the Board as required by Fed. R. Civ. P. 23.1.  Copies of the letter from Richard D. Greenfield, Esq., one of Plaintiff's counsel, setting forth such demands (the "Demand Letter") is attached hereto as Exhibit "A".  The Demand Letter and the allegations therein are incorporated herein by reference.

142.    In making the demands set forth in the Demand Letter, Plaintiff was in no way conceding the disinterestedness or independence of any of the Sands directors (nor does he now concede such with respect to the directors selected after such dates whose appointments were specifically made by or acquiesced in by Defendant Adelson).  Rather, the pre-suit demands were made to give the Board the opportunity to cause the Company to assert the claims directly, in the first instance, that Plaintiff now asserts derivatively.

143.    In his Demand Letter, Plaintiff stated:

> **"The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, dis-interested or can properly and objectively deal with such demands, which you cannot.**  Similarly, O&M is also not disinterested or independent given the manner and circumstances of its retention and the manner in which its purported "investigation" is being carried out and its participation with those of you on the Board's Audit Committee in generating the "whitewash report." [emphasis added]

144.    The Demand Letter did not include direct claims against PWC; however, under the circumstances, no demand is necessary because any such demand would have been futile

under the circumstances. Had the Demand Letter included the claims against PWC as alleged herein, the Board and its Audit Committee would have included such claims in the "referral" to the Audit Committee, as described below, and those claims would have been the subject of the same sham investigation and whitewash that has been underway with respect to the claims against the Individual Defendants.  Moreover, if Sands had brought claims against PWC, it would have implicated Defendant Adelson and the Individual Defendants including, in particular, the members of the Audit Committee.

### C.    The Audit Committee's So-Called Investigation

145.    Despite the fact that conduct described in the Demand Letter and in previous "demand futile" shareholder derivative litigation complaints involved fundamental failures of the Audit Committee and its specifically tailored responsibilities, on or about July 26, 2011, the Company's Board of Directors appointed the seriously conflicted and hardly disinterested Audit Committee purportedly to "investigate" the issues raised in such litigation.

146.    Among such failures of the Audit Committee were its toleration of and lack of adequate controls over the payment of bribes in China and serious money laundering at the Sands' casinos.  Indeed, in early 2013, in an SEC filing, Sands finally acknowledged: "There were likely violations of the books and records and internal controls provisions of the FCPA." Oversight of the "books and records [of Sands] and internal control provisions of the FCPA" went to the heart of the Audit Committee's unfulfilled responsibilities.  Moreover, the members of the Audit Committee also continued to select PWC as the Company's auditor each year despite knowing that it was not fulfilling the terms of its engagements by the Company and/or carrying out its audits of the Company's financial statements in a negligent manner.

147.    The Audit Committee supposedly retained O&M as its counsel.  However, upon information and belief, O&M was selected to represent it by lawyers representing Defendant Adelson's interests.

148.    Within only a few days following the sending of the Demand Letter and before it had even been seen by its addressees, Richard A.  Sauber, Esq., a lawyer representing defendants in a pre-existing shareholder derivative litigation, wrote to Mr. Greenfield on January 31, 2013,

in the guise of acting for the Company and the Audit Committee, whose internal "investigation" he described. He stated therein that the Demand Letter had been referred to the Audit Committee, implying that it had been the Board which made such referral, when he knew that this was not the case and had probably made such "referral" himself. In his letter, he states as to the Audit Committee's activities: "To date, the Committee has interviewed in excess of 200 individuals and reviewed millions of potentially relevant documents in multiple languages."

149.    In fact, Mr. Sauber, after being asked who he represented, given his knowledge of the purportedly independent investigative activities of the Audit Committee, only belatedly acknowledged in a February 8, 2013 e-mail to Mr. Greenfield:

> "This firm represents the served defendants in the ongoing derivative actions" and, in connection with the Demand Letter, he stated: "Daniel Bookin in the SF office of [O&M] has been taking the lead for the Audit Committee."

At all relevant times, Mr. Sauber, who represented Sands at the Suen trial, has ignored serious conflicts of interest, representing Defendant Adelson, others of the Individual Defendants and Sands simultaneously, including in connection with pre-existing shareholder derivative suits.

150.    Following the identification of Mr. Bookin by Mr. Sauber, Mr. Greenfield attempted to set up a meeting with Mr. Bookin. When such a meeting apparently was not convenient for Mr. Bookin and in light of the curious communication from Mr. Sauber regarding the Board's purported referral of the Demand Letter to the Audit Committee, Mr. Greenfield wrote to Mr. Bookin on March 7, 2013 which e-mail stated, in material part:

> "I am sorry that we could not get together while I was in San Francisco. Nevertheless, some of what I wanted to discuss with you I have set out below. I also would appreciate it if you would let me know whether you or anyone acting on behalf of the Sands Board of Directors (or its Audit Committee) will be responding formally to my letter to the Board of January 22, 2013 (the "Demand Letter"). If not, I will regard the demands set forth in the letter as constructively rejected.
> I note from a Declaration that you caused to be filed on October 30, 2012 in Moradi v. Adelson, Case Nos . 2:11-cv-490-MMD-(RJJ) [that] you stated:
> On June 10, 2011 , the Board of Las Vegas Sands Corp. ("the Company ") ratified an earlier decision authorizing its Audit Committee---composed of three outside directors, Messrs. Irwin Siegel, Jason Ader, and Jeffrey Schwartz---to respond to a subpoena from the Securities and Exchange Commission ("SEC") and an inquiry from the Department of Justice ("DoJ") concerning the Company's operations in Macau. The Board also authorized the Audit Committee to retain any outside counsel or other

advisors necessary to perform those responsibilities. On July 26, 2011, the Board designated the Audit Committee as a "special litigation committee," and expanded the Audit Committee's powers and responsibilities to include investigating the allegations in the [Moradi] action.

Pursuant to the authority ratified on June 10 and July 26, 2011, the Audit Committee retained my law firm to assist with an independent investigation of the matters raised in the SEC subpoena, the DoJ inquiry, and the above-captioned action.

Since then, my law firm has interviewed in excess of 200 individuals in both the United States and Macau to gather information relevant to the SEC subpoena, the DoJ inquiry, and the above-captioned action.

In reviewing your Declaration, several questions come to mind. I trust that you will be kind enough to provide me with answers to the following questions as soon as possible:

1.      Were you or a representative of your firm present at any portion of the June 10, 2011, July 26, 2011 or any earlier meeting of members of Sands' Board of Directors or its Audit Committee?

2.      What criteria were used by the Board to determine which of its members would be appointed "to respond to a subpoena from the Securities and Exchange Commission ("SEC") and an inquiry from the Department of Justice ("DoJ") concerning the Company's operations in Macau" and, ultimately, to serve as the members of a so-called "special litigation committee" (the "Committee")?

3.      Who participated in the determination of such criteria?

4.      Were there any factors or facts that the Board considered that might serve to disqualify any individual LVS Director from serving on the Committee?

5.      What process did the Board utilize to select those of its members who would be appointed "to respond to a subpoena from the Securities and Exchange Commission ("SEC") and an inquiry from the Department  of Justice ("DoJ") concerning the Company's operations in Macau" and, ultimately, to serve as the members of the Committee?

6.      Did anyone investigate each of the proposed members of the Committee to determine whether there were any facts or circumstances which would disqualify any of such members from serving? If so, who performed such investigation and when?

7.      Were any of the more than 200 interviews referred to in your Declaration conducted under oath and/or with transcripts of the interviews? If not, in what form were the facts gleaned from such interviews recorded and/or otherwise preserved for use by the Committee?

8.      Were interviews taken of each member of the Sands Board and those former members who were serving during the period of the possible wrongdoing being investigated by the DoJ and/or the SEC? If not, why not?

9.      Were attempts… made to interview former employees of Sands and/or its subsidiaries whose conduct is implicated in the alleged wrongdoing or who are otherwise knowledgeable with respect to it including, inter alia, Steve Jacobs, former chief executive of Sands China Ltd.?

10.     Did any members of the Committee conduct any of the interviews taken?

11.     Will your firm and/or the members of the Committee attempt to calculate the extent of the economic and non-economic damages alleged in the Demand Letters and as alleged in the derivative Complaints that have been filed?

12.     Will the Committee be investigating any of the issues raised by the Demand Letter beyond those raised by the DoJ and SEC subpoenas or in any of the shareholder derivative Complaints that have been filed?

13.     Will your firm or the Committee be taking any action as to any remedial measures which address any of the wrongdoing alleged in the Demand Letter and/or in any of the shareholder derivative Complaints that have been filed?

14.     Which persons played a role in the selection of you and/or your firm to represent the Committee?

15.     When did you first learn that you and/or your firm learn that you and/or your firm were being considered to represent the Committee, the entire Board of Directors or any of the LVS Directors in connection with a response "to a subpoena from the Securities and Exchange Commission ("SEC") and an inquiry from the Department of Justice ("DoJ") concerning the Company's operations in Macau." From whom did you learn this fact?

16.     What steps were taken to insure that there were no facts or circumstances that might justify disqualification of you and/or your firm from acting as counsel to the Committee? By whom and when?

17.     Assuming your firm performed a conflict check before being considered for the assignment ultimately accepted by you, when was such conflict check performed?

18.     Have you and/or the Committee concluded preliminarily or otherwise that Sands and/or any of its subsidiaries violated the Foreign Corrupt Practices Act ("FCPA") including "likely violations of the books and records and internal controls provisions of the FCPA" and/or applicable provisions of the federal securities laws?

19.     Have you or any member of the Committee shared any of the facts that you have uncovered and/or your conclusions, directly or indirectly with Sheldon Adelson or any other member of the Sands Board?

I would also appreciate receiving from you (a) each Board resolution delegating responsibilities to the Committee as referred to above and/or appointing its members and (b) A copy of each written demand upon Sands Board referring to any of the issues/claims in the Demand Letter I sent to it on behalf of my firm's client."

151.    Mr. Bookin responded on March 14, 2013 and provided none of the answers or documents requested. Thus, at such time and at no time subsequently did Mr. Bookin, Mr. Sauber or anyone else provide any evidence of the disinterestedness, independence and/or bona fides (nor could they be provided) of the Audit Committee or the investigations purportedly carried out by it.

152.    As Mr. Sauber indicated and as alleged in the Demand Letter, the so-called investigation "of the issues" being carried out by O&M was not only well along but virtually concluded by the time the Demand Letter was received.

153.     As alleged in the Demand Letter, the Audit Committee and O&M were and have been engaging in a massive "whitewash" of Defendant Adelson and the other Individual Defendants. Aided and abetted by O&M, which was the primary recipient of its largess to the tune of millions of dollars, the members of the Audit Committee wasted Sands' assets. The so-called investigation provided absolutely no benefit for the Company but was carried out for the sole benefit of insulating Defendant Adelson and the other Individual Defendants from liability for their wrongful conduct and ultimate accountability to Sands therefor. At the time the Audit Committee was authorized by the Board to "investigate" the claims in the shareholder derivative suits pending in Nevada, Mr. Sauber and his colleagues undoubtedly anticipated and planned on using the final report of the Audit Committee as their principal defense to the shareholder claims alleged therein.

154.     The Demand Letter states:

> "According to *The Wall Street Journal*, a preliminary version of the 'whitewash report' said the 'company's controls and books and records were not sufficient,' but even then, that 'conclusion' appears to have been based on a review of transactions initiated by previous senior officers, including former president Weidner, from 2003 to 2009, rather than a comprehensive review...It is not surprising that the 'investigation' is not pursuing all material leads that would generate...evidence."

155.     Besides the fact that the purported "investigation" was intentionally circumscribed in such manner as to avoid finding liability on the part of the Individual Defendants, instead of developing a record that could be used by the Company if it was to ever pursue litigation against the Defendants herein or others (the determination of which was a principal stated mission of the Audit Committee), none of the more than 200 interviews that had been conducted (purportedly by the Committee but, in fact, by O&M) were recorded, transcribed or under oath. Thus, if the Company was ever to pursue litigation, it would be forced to expend massive amounts to create a record that could have been maintained *ab initio*.

156.     In addition, upon information and belief, neither the Audit Committee nor O&M interviewed (or attempted to interview) some of the most knowledgeable witnesses in connection with the wrongdoing alleged in the Demand Letter including: Richard Suen; Steven Jacobs; Jerry Markling; Qian Qichen; Liu Qi; Tom DeLay; Edmund Ho; Marc Stanley; Leonel Alves;

Marshall Hao; Fernando Chui Sai On; Yang Saixin; Cheung Chi-tai (a.k.a. Tsang Pau); Wong Kam-ming; Steve Vickers; Steve Wynn; Jim Murren; Ausaf Umar Siddiqui and Zhenli Ye Gon.

### D. The Board's Constructive Rejection of Plaintiff's Demands

157.    Despite the fact that O&M and the Committee were already implicated in the "whitewash" described in the Demand Letter, Plaintiff's counsel repeatedly sought to learn from Messrs. Bookin and Sauber material facts relating to the Demand Letter and the purported "investigation" of the "issues" raised thereby.  He was repeatedly "stonewalled" by Messrs. Bookin and Sauber.  In fact, the Board's response to the Demand Letter has been corrupted and, because there has been no response to it despite the passage of so much time, the demands set forth therein have been constructively rejected.

158.    Besides the substantial passage of time since Plaintiff's Demands were made (as well as the most serious wrongdoing was brought to Board members' attention), the prevailing circumstances indicate that Plaintiff's Demands have been constructively rejected by the Sands' Board.

159.    The Individual Defendants are exposed to potential liability for operating Sands without adequate internal controls for compliance with, *inter alia*, the FCPA, state gaming laws, and the Bank Secrecy Act, that would have detected and prevented, among other wrongful conduct, improper inducements that occurred in Macau for an extended period of time, the operation of the Company's junket business with Chinese organized crime, and the Company's involvement in money laundering activities.

160.    The Individual Defendants have benefited from the wrongdoing, alleged herein, and have engaged in conduct to preserve their positions of control and the perquisites derived therefrom and to protect themselves from personal liability for their acts of mismanagement and for their breach of fiduciary duties.

161.    To properly prosecute this lawsuit, the Individual Defendants would have to sue themselves, which would expose themselves to tens of millions of dollars in civil liability and/or sanctions.

162.    The officers' and directors' liability insurance policies covering the Individual

Defendants contains an "insured versus insured exclusion" clause which would eliminate coverage for any action brought directly by Sands against the Individual Defendants. As such, the Individual Defendants, not wishing to face liability, will not cause Sands to sue the Board.

163.     In light of the Individual Defendants' personal culpability and responsibility for the wrongful acts described herein, and the insurance policies in place, the Individual Defendants are not disinterested with respect to responding to Plaintiff's Demand Letter.

## VIII.   PROXY STATEMENT ALLEGATIONS

164.     At all relevant times, each of the Individual Defendants, because of their advisory, executive, managerial, and directorial positions, had access to adverse, non-public information about the Company's financial condition and operations, including the wrongdoing alleged herein.

165.     Each of the Individual Defendants, because of their positions of control and authority as officers and directors of Sands, directly and/or indirectly, exercised control over the contents of the various public statements issued by the Company, including Sands' proxy statements issued and disseminated by them.

166.     On or about April 26, 2013, the Individual Defendants caused the issuance and dissemination of Sands' Notice of Annual Meeting and Proxy Statement ("2013 Proxy Statement") announcing and soliciting shareholder votes in connection with Sands' Annual Meeting of Shareholders held on June 5, 2013.

167.     Among the items of business for consideration by Sands' shareholders at the Company's 2013 Annual Meeting was the re-election of four directors named in the 2013 Proxy Statement, Defendants Adelson, Chafetz, Chaltiel and Koppelman, each of whom was put forward for re-election by the Board.

168.     At the time of the 2013 Annual Meeting, the Board had ten directors, consisting of the Individual Defendants, each serving three-year terms. The four nominees for re-election, Defendants Adelson, Chafetz, Chaltiel and Koppelman, were for a three-year term, which does not end until 2016.

169.     Upon information and belief, each of the 10 directors serving as of April 26,

2013, personally approved the substantive content of the 2013 Proxy Statement and/or indirectly controlled its content, all the while omitting material facts bearing upon how the shareholders of the Company would vote upon, *inter alia*, the Board's nominees for directorships.

170.   Despite federal disclosure requirements, the Board caused the Sands' 2013 Proxy Statement to be issued on the Company's behalf to misrepresent the manner in which the Board members were and are selected and evaluated.  The 2013 Proxy Statement represents, "In addition to the specific professional experience of each director, we chose our directors because they are highly accomplished in their respective fields, insightful and inquisitive.  In addition, we believe each of our directors possess sound business judgment and is highly ethical."  In reality, Defendant Adelson handpicked all of the directors.

171.   More significantly, if the Proxy Statement had disclosed the facts set forth herein in neutral, non-pejorative terms, Sands' shareholders would have been able to conclude from such fact that the statement "we believe each of our directors possess sound business judgment and is highly ethical" was false.

172.   Moreover, the Board never conducted any objective evaluation of the conduct of its members including, in particular, the wrongful conduct of Defendant Adelson, to whom each other director owed his highly lucrative position on the Board.

173.   The 2013 Proxy Statement also omitted non-pejorative material facts about the four nominees for re-election to the Board, which the Company's shareholders would have wanted to know in voting upon the re-election of directors.  Specifically, it failed to disclose the extent to which such members of the Board participated in and/or acquiesced in the Company's violations of, *inter alia*, the FCPA, Bank Secrecy Act, the Sands' Board of Directors Corporate Governance Guidelines, the Audit Committee Charter, the Anti-Corruption Policy and the Code of Business Conduct and Ethics.

174.   In order to induce Sands' minority shareholders to vote in favor of the re-election of Defendant Adelson and the other three nominees and to bolster their apparent legitimacy as directors, the 2013 Proxy Statement set forth various representations that the Board followed (including the four nominees), *inter alia*, the Code of Business Conduct and Ethics.  Each of the

following representations was false and misleading so as to lead Sands shareholders to believe that the nominees for re-election warranted favorable votes when they did not.

175.    The nominees for re-election to directorships of Sands, as set forth in the Company's 2013 Proxy Statement, were elected, and such elections were an essential link between the false and misleading proxy statement and the wrongdoing such directors engaged in following the 2013 Annual Meeting.  To the extent that their serving as directors damaged the Company, as described herein, such damages would not have taken place but for their election. These directors receive lucrative compensation packages from Sands for sitting on the Board, including fees for committee chairs and "reimbursement of expenses."  Such compensation paid to the directors amounted to damages that would not have been sustained by the Company but for the 2013 Proxy Statement.

## IX.    DAMAGES SUFFERED BY SANDS

176.    The Board and senior management of Sands, including Defendant Adelson, in particular, failed to act in accordance with any legitimate exercise of business judgment and consistently with the fiduciary duties owed by them to Sands and its shareholders.

177.    Sands' directors utterly failed to implement validly functioning reporting and controls to prevent Sands' serious violations of the FCPA and Defendant Adelson's blatant directives, and to stop the Company's ties to organized crime in Macau.

178.    As a result of the Individual Defendants' breaches of their fiduciary duties as described herein, Sands has been exposed to substantial injury to its reputation and corporate good will, as well as to potential criminal and civil liability, and the possibility of having its gaming license revoked or suspended.

179.    As a direct result of the wrongdoing referred to herein and the Individual Defendants' concealment thereof in filings with the SEC and otherwise, investors have been defrauded and the Company has been named as a defendant in class actions commenced by such investors.

180.    The Company also has been caused to expend tens of millions of dollars in the defense of the Suen and Jacobs lawsuits, among others, and in connection with the ongoing and

concluded SEC and DOJ investigations referred to herein.  As a direct consequence, Sands has incurred and will continue to incur substantial costs of defending against such litigation and investigations and, ultimately, resolving them with Sands' funds despite the fact that the underlying wrongdoing was and is the responsibility of the Individual Defendants named herein.

181.   Sands has suffered and will continue to suffer substantial harm to an extent not yet fully capable of determination.  Because earnings from Macau properties account for over two-thirds of Sands' reported overall revenue, any adverse finding by SEC or DOJ investigations would have an enormous impact on the Company's future.  Indeed, the Company experienced a $4.4 billion decline in market capitalization on March 1, 2011 when it disclosed the SEC and DOJ investigations.

182.   The wrongdoing of each of the Individual Defendants and PWC as described herein was an essential link in the damages caused and being caused to Sands and its shareholders as a result thereof.  As a direct and proximate result of such wrongdoing, Sands has expended and will continue to expend large sums of money to comply with subpoena requests and cooperate with the SEC, DOJ, NGCB, and FBI investigations, and to conduct any further investigations that may be necessary.  Additionally, an adverse finding by any of the regulatory agencies investigating Sands could result in fines, sanctions and disciplinary actions against the Company.  Moreover, the investigation of at least certain of the underlying claims and the manner of the investigation purportedly being carried out by the members of the Audit Committee, aided and abetted by O&M, has been a waste of the Company's assets since such investigation was not and is not for Sands' benefit but solely for the benefit of the Individual Defendants.

183.   For a period of many years, Sands' senior management and members of the Board became knowledgeable of but nevertheless concealed definitive and material information with respect to the Company's FCPA violations, criminal junket business, and other wrongful conduct as described herein.  Even now, the Individual Defendants continue to cause Sands to conceal the most material information from its shareholders and the investing public generally.  By such concealment, the Individual Defendants have subjected the Company to additional investor

litigation and massive claims.

184.    Macau is the only place in China where casinos are legal, and the Company's properties there provide the majority of its revenue.  While corruption has been rampant in Macau, the central government of China periodically has taken action to penalize companies and individuals that have been found to engage in corrupt activities, particularly bribery of governmental officials.  It is inconceivable that the allegedly illegal activities of the Company and SCL are not on the "radar screen" of China's anti-corruption regulators and, thus, they are vulnerable to having their legal activities curtailed or even eliminated.  Any corrupt or otherwise illegal conduct (such as illegal foreign exchange dealings) by SCL or LVS (through their respective executives) leaves the Company vulnerable to a material negative event.  Moreover, the Company has put its substantial assets in Macau at risk by engaging in acts and practices (through junkets and otherwise) designed to evade China's limitations of money transfers for gambling purposes, all of which evasion is acquiesced in by the Individual Defendants.

185.    In addition to the vulnerability of the Company's operations in China (including Macau), more likely, in the states of New Jersey and Nevada, based on the proven or suspected activities described herein, Sands and its senior executives, including Defendant Adelson, are vulnerable to being found to be unsuitable to operate casinos in such states.  These activities and the investigations in their wake have not only caused the Company substantial direct and indirect expenses, but have rendered it vulnerable to massive damages should its casino licenses be placed in further jeopardy or lost.

## X.    REQUEST FOR APPOINTMENT OF CONSERVATOR OR SPECIAL MASTER

186.    The Company has been the subject of far-reaching and serious investigations with respect to the wrongdoing alleged herein, including multi-year investigations by the SEC and DOJ.

187.    Because the Company's Board suffers massive conflicts of interest due to the personal culpability of Defendant Adelson and other members of the Board, the members of the Board are not capable of advancing solely the Company's interests and not their own.  Moreover,

the legal counsel acting for them similarly have not acted exclusively in the Company's best interests in dealing with the foregoing investigations, in connection with possible resolution of claims against Sands, and in seeking the dismissal of pending shareholder derivative suits. Based upon the facts and circumstances described herein, it is a virtual certainty that the members of the Sands' Board or their legal counsel will not deal with this litigation objectively and solely in the Company's best interests.

188.   In order that the Company's interests be addressed to the exclusion of all others, Plaintiff requests the appointment by the Court of a Conservator or Special Master to oversee the Company's dealings with the DOJ, the SEC and any other agencies investigating it in connection with the wrongdoing alleged herein and in connection with the Company's response to this litigation in order that the Company's interests are put before all others and are not compromised by the defense of the Individual Defendants and/or material conflicts of interest on the part of their legal counsel.  Should the Company's interests continue to be represented as they are at present by conflicted counsel whose principal allegiance is to Defendant Adelson and the other Individual Defendants, Sands will be irreparably harmed.

### COUNT I

(For Violations of Section 14(a) of the Exchange Act)

189.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

190.   This claim is asserted by Plaintiff individually against the Individual Defendants who were members of the Company's Board of Directors when the 2013 Proxy Statement was issued and disseminated to Sands shareholders.  Such claims arise from their violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 in connection with such Proxy Statement issued for the 2013 Annual Meeting of Shareholders.

191.   Through the 2013 Proxy Statement, the Board solicited the votes of Plaintiff and the other Sands shareholders in connection with, *inter alia*, the re-election of Defendant Adelson and three other members of the Company's Board.

192.   The Board, through the 2013 Proxy Statement, recommended that Sands'

shareholders vote in favor of each of the Board's proposals and, in particular, in favor of the re-election of each of Board members nominated for re-election.

193.    The 2013 Proxy Statement contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as more fully set forth above.  In particular, the 2013 Proxy Statement failed to disclose material information regarding the nominee directors and the conduct of Sands' business by them, as set forth above.

194.    In addition to the frustration of their suffrage rights, these deceptions proximately caused Sands and each of its shareholders direct and indirect economic and other damages following the 2013 Annual Meeting in an amount which cannot presently be determined.

195.    As a result of the use by the Company's Board of Directors of the 2013 Proxy Statement to solicit the votes of Sands' shareholders, which Proxy Statement failed to disclose the material facts set forth herein, the Board's four director nominees, as well as the other Board proposals, were approved.  Such votes in favor of the Board's proposals, including the re-election of Defendant Adelson, violated Plaintiff's suffrage rights and caused him damage in an amount which cannot presently be determined.

196.    By utilizing such Proxy Statements, the suffrage rights of Plaintiff and each other shareholder of the Company have been violated, which conduct is in violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

### (For Violations of Section 14(a) of the Exchange Act)

197.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

198.    This claim is asserted by Plaintiff derivatively on behalf of Sands against the Individual Defendants who were members of the Company's Board of Directors when the 2013 Proxy Statement was issued and disseminated to Sands shareholders.

199.    As a result of the use by the Company's Board of Directors of the 2013 Proxy Statement to solicit the votes of Sands' shareholders, which Proxy Statement failed to disclose

the material facts set forth herein, the Board's four director nominees, as well as the other Board proposals, were approved.  Such votes in favor of the Board's proposals, including the re-election of Defendant Adelson, damaged the Company in an amount which cannot presently be determined.

## COUNT III

### (Breach of Fiduciary Duty and Waste of Corporate Assets)

200.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

201.    The Individual Defendants all owed and/or owe fiduciary duties to the Company and its shareholders to exercise candor, good faith and loyalty.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Sands the highest obligation of good faith and loyalty in the management and administration of the affairs of the Company, including the oversight of Sands' compliance with federal laws such as the FCPA, particularly in Macau where the culture does not discourage improper payments to obtain or retain business.

202.    Moreover, the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles, and as set forth above, that, had they been discharged in accordance with the Board's obligations, would have necessarily prevented the misconduct and consequent harm to the Company, as alleged herein.

203.    The Individual Defendants consciously violated their corporate responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of Sands and its shareholders.

204.    As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, they have caused the Company to waste valuable corporate assets and expend its corporate funds unnecessarily.

205.    As a result of the misconduct alleged herein, Sands has sustained and will continue to sustain significant damages, not only monetarily, but also to its corporate image and goodwill.

206.    As a result of the misconduct alleged herein, the Individual Defendants are

personally liable to the Company in an amount which cannot presently be determined.

## COUNT IV

### (Unjust Enrichment)

207.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

208.    Each of the Board members named as defendants herein, was or is being unjustly compensated by Sands with compensation packages and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein.

209.    Each of the Individual Defendants who have been unjustly enriched by the wrongdoing set forth in this Complaint should be required to account for and repay the Company therefor, together with their earnings thereupon.

## COUNT V

### (Breach of the Duty of Candor)

210.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

211.    Each of the sitting Sands' directors, at the time of the issuance and dissemination of the Company's 2013 Proxy Statement, by reason of the fact that such proxy statement was and is false and misleading, as described herein, breached his or her respective duties of candor owed to Sands, Plaintiff, and the Company's other shareholders.

212.    For the reasons set forth with respect to Plaintiff's Exchange Act claims, he is entitled to injunctive relief as set forth below and such damages as he may prove at trial.

## COUNT VI

### (Breach of the Duty of Loyalty)

213.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

214.    The wrongful conduct of the Individual Defendants breached their respective duties of loyalty to Sands and, as such, should be held accountable to Sands for the wrongful conduct described herein.

## COUNT VII

### (Breach of Contract)

215.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

216.   This claim is alleged against Defendant Hipwell, as a Partner of PWC, as a result of PWC's breach of the engagement contracts entered into with the Company including, *inter alia*, its failure to perform audits of Sands' year-end financial statements in conformity with GAAS, as PWC was obligated to do.

217.   As a direct consequence of its breach of its engagement contract with Sands, the Company has been damaged in an amount which cannot presently be determined.

## COUNT VIII

### (Negligence)

218.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

219.   This claim is alleged against Defendant Hipwell, as a Partner of PWC, as a result of its negligent performance of PWC's audits of the Company's financial statements as described above.

220.   As a direct consequence of its negligence, the Company has been damaged by PWC in an amount which cannot presently be determined.

## COUNT VIII

### (Unjust Enrichment)

221.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

222.   This claim is alleged against Defendant Hipwell, as a Partner of PWC, as a result of PWC's receipt from the Company of millions of dollars in unjustly paid fees and other compensation.

223.   As a direct consequence of its conduct as described herein, PWC has been unjustly enriched in an amount which cannot presently be determined. PWC through its Partner,

Defendant Hipwell, should be required to account for and repay the Company the amount by which PWC was unjustly enriched together with its earnings thereupon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Appointing a Conservator or Special Master to oversee and direct (1) the Company's negotiations with the DOJ and the SEC with respect to the wrongdoing alleged herein; and (2) to act in place of Sands' Board in connection with the Company's response to this litigation or any other pending shareholder derivative litigation in which one or more of the Individual Defendants herein is named as a defendant;

B.   Appointing a Chief Compliance Officer with specific responsibility for overseeing and enforcing Sands' compliance with the FCPA, the Bank Secrecy Act, the Dodd-Frank law, the Sarbanes-Oxley Act, state and local rules and regulations applicable to the Company's gaming activities (including anti-prostitution laws) and applicable federal securities laws;

C.   Determining that Sands' 2013 Proxy Statement is false and misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and that the Board has breached its duty of candor;

D.   Declaring that the current and former directors of the Company named as defendants herein have breached their fiduciary duties and wasted Sands' assets, as alleged herein, causing substantial damages to Sands;

E.   Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

F.   Finding that PWC has breached the terms of its engagements by Sands causing substantial damages to it;

G.   Finding that PWC has negligently performed its audits of the Company's year-end financial statements causing Sands substantial damages;

H.   Requiring the Defendants to repay the Company to the extent they have been unjustly enriched by their wrongful conduct, as described herein, together with their earnings upon such amounts;

I.   Ordering the Company to take all necessary actions to reform and improve its corporate governance, compliance and internal control procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

J.   Awarding Sands restitution from Defendants;

K.   Determining and awarding to Sands exemplary damages in an amount necessary to punish the Defendants;

L.   Awarding Plaintiff and his counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

M.   Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 22, 2014

ALBRIGHT, STODDARD, WARNICK AND ALBRIGHT

G. Mark Albright
Nevada Bar No. 1394
William H. Stoddard, Jr.
Nevada Bar No. 8679
801 S Rancho Dr D4, Las Vegas, NV 89106
(702) 384-7111
Fax: (702) 384-0605
Email:  gma@albrightstoddard.com
Email:  bstoddard@albrightstoddard.com

Richard D. Greenfield
Ilene F. Brookler
Marguerite R. Goodman
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: 917-495-4446
ibrookler@gmail.com
whitehatrdg@earthlink.net
twowhitehats@earthlink.net

Rose F. Luzon
Valerie Chang
SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: (619) 235-2416
rluzon@sfmslaw.com
vchang@sfmslaw.com

Scott R. Shepherd
SHEPHERD, FINKELMAN, MILLER&
SHAH, LLP
35 E. State Street
Media, PA 19063
Tel: 610-891-9880
sshepherd@sfmslaw.com

**Counsel for Plaintiff**